Our second case this morning is No. 23-17-15 Jizang Super Lighting Electronic Appli v. CH Lighting Technology. Okay, Mr. Lampkin. Thank you, and may it please the court. I'd like to focus on two errors today. The first was the erroneous grant of J-Mal, mid patent on two... Good trial on two patents. And second is the admission of the damages that's spent from Ms. Kindler. I'd like to begin with damages, because whatever the other complexities of this case, the damages estimate contravenes this court's precedent. The plaintiff's expert proposed a royalty that exceeded for one, any one of three patents, that exceeded the royalty that plaintiff ever received for the entirety of its 261 patent portfolio. And that was contrary to Weiland, MLC, and Omega, which have a clear requirement. When experts rely on prior licenses that cover a range of patents, a large number of them, they must, and I'm quoting, address the extent to which the other patents, patents other than the ones being asserted, contributed to the prior royalty. But Ms. Kindler didn't do that at all here. For the Linera license, which was 261 patents, none of them asserted in this case. There was no analysis whatsoever about how much of the other 257 licenses contributed to the royalty. For the TCP license, she said that 14 licenses, or 14 patents drove that license in TCP, but then never identified only one of them at issue here, and never had determined how much the other 13 licenses contributed. And yet, came up and told the jury, give Super more than Super had ever received for its entire portfolio for just any one of these three licenses. Did she say that the other two asserted patents here are somehow technically comparable to some of those listed 14 patents? So there is a statement in there that she said that they were similar to, but the question isn't, are they similar to? The question is, did the other patents contribute to the value? And unless they didn't contribute to the value, you can't count 100% of the 261 patents, all of it, all royalty, towards the one, any one of three patents here. And I think this is actually much worse than Weiland, because at least in Weiland, the expert said it was one of six patents that drove the... Excuse me, six patents drove the prior license, and one of them is asserted here, and he therefore gave a 25% discount to account for the other five patents. But this court reversed anyway and said, look, you haven't explained why the other five patents are only worth 25%. Can there be circumstances where you're licensing a 261 patent portfolio, but you, the licensee, really only care about 14 of them? And in the negotiation process, the patent owner says, let me just go ahead and give you a license on everything, even though you don't really care about the remaining, I don't know, 247 patents. I think that type of apportionment is what an expert would want to do, say, oh, I've determined that only 14 out of these 260 drive the negotiation, and they contribute to the entirety of the value. But what we have here is 14 that supposedly drove the negotiation, but only one of them is asserted here, and there's no analysis of how much value the other 13 gave. And I think that's... It can't be right when the 25% discount is enough, that instead you discount and you actually increase the value to give three times the royalty in one of the prior licenses, and one and a half times the royalty in the other prior license. And in this case, it actually turns out the royalty was 40% of C.H. Lighting's total profit, not the profit attributed to the infringement, 40% of its total profit on every sale. And for what? And that's at page Appendix 10772 and Appendix 10000125. That's from their own expert, by the way. And for what? For taking a light strip, the LED strip, and disposing it directly on the tube, having diffusion film. Or for, as Super would describe it, for having an electric shock system that, rather than staying off and checking to see if it's properly installed, will briefly turn on and shock the individual installing it, and then turn it off. For that 40% of profit doesn't make sense. It is even apart from the requirements of YLAN. That's the type of thing that's sort of the monstrous and excessive type of royalty that simply cannot stand. Okay, I think maybe we should turn to the on sale bar issues, unless there are further questions about the damages. Yes, yes, certainly. So we think that... It seems to me that you're relying primarily on the exclusion of two documents or set of documents that would prove that the tubes were on sale. One of them is DX41, and the other one is the safe light documents, right? Yes. With a correction, we think what did come in was sufficient, because he pointed specifically to the fact that a Philips spec sheet had a 2014 date, and he pointed specifically to, as he said, clear light of day, a copyright on the Cree tube, it was also 2014. But yes, I think there would have been much more evidence, but for the exclusion of DX41 and the Max Light documents. That's correct. If I turn to the DX41 first, if that's... If Judge Light is interested in that, I could... Yeah, what I'd like to hear, it seems to me that there's this discussion about wattage, which I frankly don't understand. Because as I read the record, your expert testified that the Philips tube that was reconstructed or deconstructed by Super met the claim limitation, so it wouldn't make any difference. It might have been different wattage from the other tubes. I think that's exactly right. First, I wanna make clear that if you look at page 11,258, this is his expert report. It's in volume four, because we have way too many volumes here. 11,258? Yes, 11,258. This is the expert report, and this is the Philips tube. And so he's... And this picture right here... Which Philips tube? The TLD 14.5 watt Instafit. This is the 14 watt? Yeah, it's 14.5 watt. It's right there in his expert report. And this image is an image from DX41, the super teardown, showing that they had possession of it. And so he's saying, look, they had possession of this very bowl, the 14.5 watt. We have it in their documents. And if you look at the Bates number there, that Bates number corresponds exactly to DX41, which is on page 20,069 and 20,071. So he's saying this very teardown, this very bowl is invalidated. And you can tell because it says one on paragraph 1193. He says, I understand it was in Panta's possession. And then in paragraph 1194, the last carry over sentence to the next page, the Philips Instafit LEDT8 tubes demonstrate that the material claimed in at least 41 of 43 of the OASAP patent and claims 1, 2, 29, and 30 of the 125 patent was not novel or non obvious. So he's not saying this is an equitable conduct. He's saying it existed because you had it, this very tube, and this very tube is invalidating. But even if there were a difference in wattage, one in some elsewhere in his report was 16.5 watts, and this one is 14.5 watts, that wouldn't make this irrelevant. They're from the same series, and there's been no explanation why a tube... I'm getting confused. I feel like there's two different arguments potentially going on here. One is, can we just get this slide in to be admissible for consideration because this particular teardown of a particular tube is a very, very close cousin to the tube that we actually wanna rely on to invalidate a bunch of claims. Then there's a second argument, which is, well, maybe the tube that was actually torn down and discussed in this slide itself is invalidating a bunch of claims. I think that's right, and I think... Which argument or arguments are you actually relying on? Because to be honest, when I looked at your blue and gray brief, I didn't see you making the latter argument. I saw you focusing on, stressing, and exclusively contemplating the idea that, please let us get this slide in because it's a very, very close cousin of the tube we actually want to rely on, and so we think it's highly relevant to the other tube not torn down that we wanna rely on for invalidity. Right. And I think we understated it because this is the actual tube you disclosed and relied on in it, but if you take a look at the record, we very clearly made below... I'm talking about for purposes of appeal here. We're making both arguments here. I know, but I only saw one. Yeah, I think that... So help me. Did you really make two here on appeal? I think both arguments are there because we say any differences are immaterial, and that wattage can't make a difference, and that, truthfully, the difference in wattage, that's a difference in ballast, and I can explain it. I know, but it's still product X and product Y. It's from the same exact... Even if it's product X and X prime, there's still two different products. I think both arguments are fair because it's the exact same one is included in the notion that any differences are immaterial, but at the very least, any differences are immaterial because the expert said, I can look at the schematic and I can tell you it's the same product or at least the same series, and how does the wattage affect whether or not the tube... Excuse me, the strip is disposed on the inner circumferential surface and there's diffusion film. It just doesn't make a difference, and if the expert's willing to testify, I don't understand how you could possibly exclude this evidence. The judge originally said it was for inequitable conduct only, but it's in our report for non obviousness. It's in our report for it was already on sale. It's not thought about in inequitable conduct. Right there, those two paragraphs are... It was available. Did you say to the judge below, we need this slide because this... Don't be confused. Judge, you think this product that got torn down is different from the product we wanna rely on, but actually, this very product that got torn down, we wanna rely on it for invalidity purposes. See our expert report. Page 10,217 of the appendix, page 74, lines 20 and 25. For example, the DX41 document we talked about throughout this trial shows that the prior art tubes were on sale. Court asks, these specific products answer, certainly, the series, and in one case, our expert believed it was the same product, Your Honor, the same product, Your Honor. So if they're not kissing cousins, they're identical. And so these should have been admitted, and it's an abuse of... Remember, relevance is actually a very low standard. Does it tend to make something more likely than not? Does it tend to make it more likely? If they wanna cross examine and say, this is the 14.5 watt, there's only a 16 watt that you have in your possession, in your pictures, that's fine. But does it make it more likely that the 16.5 watt in the same series was on sale when Super was in possession of a 14.5 watt version in the same series? It absolutely does. It's clearly relevant, and it's an abuse of discretion to exclude it. Well, let's talk about the safe flight documents. Yes. The judge seemed to exclude these on the ground that you hadn't listed them when you listed the witness who was gonna testify about them. I guess, ultimately, that would have been Marsh. Yes. So the ground... Which seems to be problematic because there's no requirement in the rules or any standing order requiring such listing. But... It's... Applying a non existent rule, Your Honor, is an abuse of discretion. So it's an especially clear abuse of discretion here, because if I could turn the court to page... I keep going to documents, but if you take a look at what Super did, and we cite this on page 41 of our brief, Super's own disclosure just simply says that we'll provide witnesses to authenticate documents, but doesn't say specifically which witness will authenticate which document. It's simply not a requirement. And on page 43 of our brief, we cite the Northern District of Texas case, which lists a lot of other cases, showing it's just regular practice, at least in the Fifth Circuit, that you can say a corporate representative. You don't have to go further and give the corporate representative's name. And that's exactly what Mr. Marsh... Okay, but so, accepting that, but looking at the judge's discussion of this, and it's... Covers a couple of pages in the appendix, he also seems concerned that the Safe Flight documents don't show on sale. Am I correct about that? I think he may have been concerned about how clear they were, but the Safe Flight document, the spec sheet that we were talking about there, actually has a date on it, and it shows the date is in 2014, not 2015. Okay, but there's no evidence in the record about its dissemination to people who might accept the offer, right? No, I don't think we had evidence of that, but there were a bunch of... This is just one of multiple documents that might show this, and in the end, the expert would be able to say, yes, this is the type of spec sheet, and it's a revised version of the spec sheet. This is the type of spec sheet that shows that something is on sale. But every single of our Max Flight documents, not just that one spec sheet, every Max Flight document we had was excluded based on an erroneous rule that somehow we had to identify by name the individual who would authenticate them, a rule that wasn't applied to Super. And so simply applying a non existent rule unevenly between the parties, that's an abuse of discretion. The district court didn't say it wouldn't have been different anyway, it wouldn't have... It would have been a harmless error. He simply said, I'm going to exclude it, and once it was excluded, decided that we didn't have enough evidence. Notwithstanding the fact that our expert actually pointed to a Phillips spec sheet with a 2014 date on it, that our expert pointed to a 2014 copyright. This all would have been sufficient standing alone, but it's especially problematic when the district court, based on an erroneous view of the law, excluded our expert... Our witness from authenticating the documents, and therefore the jury seeing these documents, which would show that these items were on sale before the critical date. If the court has no further questions, I'll reserve the remainder of my time for that. Okay, we'll give you two minutes. Thank you so much. Mr. Bernstein. Your Honors, good morning. May it please the court. You might start off where we just left off on the exclusion of these documents, the DX41 and the SafeLight documents. The MaxLight documents? MaxLight, sorry. So, the opposing counsel mentioned and relied on what Dr. Levy said in his expert report, and the reference to the Phillips tube, there was no discussion of that at trial. All he did at trial... How could he do it when the document was excluded? So, all he said with respect to, at the beginning of his analysis of the prior art on each of the tubes, he gave a one sentence statement saying, I reviewed the documents, and here's... I have determined that there's prior art. So, I wanna start there, but I'll go to his actual expert report, because, Your Honor, that's what he said in his actual expert report as well. He gave a one sentence at paragraph 1004, 1006. What page are you at? This is his expert report that starts at 10876, Your Honor, and it's paragraph 1004, 1006, and 1008. Appendix 10876, that's where his expert report starts. This is volume three. 1,000... 10,876. Yeah, that's the first page of the report. Right, so it's... I'll find it, Your Honor. It's paragraph 1004, 1006, and 1008 of his report. I apologize. It's volume four? Yes. You said paragraph 1004? 1004, 1006, and 1008. Okay, that's on JA11200. And so, in his expert report, he had the same one sentence conclusion about the prior art. There's no analysis that he did on how any of the references actually, or any of the documents actually, showed that the references were on sale in any way. He had a conclusory opinion in his expert report. No, what he says with respect to DX41 in the expert report, he says, one, I've analyzed the Phillips tube that's discussed in DX41, and I find that it satisfies all the claim limitations. And then he also says that the fact that Super possessed the tube and was deconstructing it shows that it was on sale, right? He says those things. So, not in his invalidity part of his report, that's in his inequitable conduct. He's assessing materiality when he made the statements. The statements that Mr. Lamkin made are in the context of inequitable conduct and materiality. When he was discussing in his report what was actually on sale and why it was on sale, he did not refer to this document. And Judge Albright, that's part of the reason why Judge Albright excluded the document as being related solely to inequitable conduct. Well, show me again where the part you're saying, he limited his discussion of on sale bar. What 11... That's 1182 through 88. That's the paragraph numbers in the report. 1188? Yes, 1182 to 1188. 1182. I'm sorry, what page of the appendix? It could be JA11255. So these paragraph numbers are about the Cree tubes? Is that right? That's correct. I mean, here on page 11257, he's talking about the Phillips tube, and he says, the plaintiff was in possession of the tube, and elsewhere he says that that tube satisfied the claim limitations. I mean, this is paragraph 1189, is directly addressing that tube, right? It is, but it's not in the context of invalidity. It's not the invalidity section of his expert report. Well, but it says, he says, disclose or render obvious all the limitations. I mean, it does. I don't dispute that it does, Your Honor. The point was, and I think that part of the reason why Judge Albright ruled the way he did, is because this is not in the invalidity section of the expert report. This is... Whether it's in that section or not, he's saying that it renders it invalid. So, yes, Your Honor, that is accurate, but it's, again, an expert is tied to what he says in his expert report. And if he, in establishing whether something is on sale or not, his opinion in his report is not based on the document. It wasn't... Judge Albright didn't abuse his discretion by precluding the expert from using a document in a different way. But let's go back to the basis for why the judge excluded the Max Line documents. It was because he thought that it was unfair to not have pre identified the corporate representative that was going to authenticate the documents. Is that right? So, Judge Chen, Judge Albright never actually excluded the Max Line documents? Right. He excluded Eric Marsh, who was going to testify as the corporate executive for Max Line to prove up that these documents are Max Line documents. Correct. He put... Just to be clear, Judge Albright did say that CH Lighting, the appellants, could use... Anything referenced in the expert report could be used in a good attempt to get the documents into evidence. They just... Okay, but his ground was wrong. In excluding the Max Light documents, he said, I'm excluding them because you didn't list them in advance. That's just wrong, right? I respectfully disagree, Your Honor. Okay, why? Because Rule 26A, your initial... At least your initial disclosure requirements, if you have a witness that has information, a specific witness or a party that has information about the prior art or documents related to the prior art, you have to identify that person. Otherwise, we did... They identified Marsh as the person who was gonna testify. I mean, a week before trial. They didn't do it in discovery. Well, that was because... You knew that there was gonna be a witness testifying on authentication, right? Absolutely not. Because when we got the witness list from CH Lighting, from the appellants, when we... A month before trial, when we got the witness list, Mr. Behetti was on that, will testify by deposition. Not live. Mr. Behetti was never going to authenticate anything. They also put on this random witness, like Max Light representative, will test or may testify live or by deposition. And so Mr. Behetti... So your theory is that, not that they had to list the documents, but that they had to identify that there was gonna be an authentication witness? Well, I think there's two things. I mean, it is clear, right, that there's no requirement of listing the documents that are gonna be authenticated. That's correct, right? So I... In the initials... Yes, no. There's no requirement just to list the specific documents that are gonna be authenticated. Okay, so to the extent that he said that, he's wrong, right? Yes. I don't, Your Honor, I don't think that is what Judge Albright said. I think that what Judge Albright meant is you can't identify... You have to identify somewhere that a witness is gonna be testifying about a particular... Where's the ruling? Where's the ruling? So this is at Appendix 00068. What's that? Volume one? Volume one, Your Honor. And this is where Judge Albright... I mean, the ruling was that they never provided us notice that Mr. Behetti... Okay, where are you on the page? What are we looking at here? This is the... This is the post trial motions ruling? This is his order. On the post trial motions? Correct. Okay, so where does he say this? Now, this is the second point. At the bottom of the page, defendants conceded on October 27th that they failed to provide notice of plaintiffs during discovery that Mr. Behetti would be authenticating max A documents. Right, and then on the following page, it says defendants argue that disclosing a corporate representative is sufficient to the notice requirements, and that even if it were not proper, a late disclosed witness should not be excluded if the late disclosure is substantially justified or is harmless. Upon consideration of the party's arguments, the applicable law, the court finds defendants' arguments unpersuasive and not sufficient to launch a new trial period. No explanation. Right, but I think there was an... Just from a district court judge standpoint, or from my standpoint, how do I know during discovery to ask a witness about certain documents? If they had said... You ask an interrogatory, which documents are you relying on? Well, but we asked... I mean, we took the deposition of Mr. Behetti. At least the way I was always taught, Your Honor, is that if you're gonna rely on a witness to testify about something at trial, you identify that witness in the topics in your initial disclosures or your supplemental initial disclosures. I think I heard Mr. Lampkin earlier say that Super's pretrial disclosures also did not identify which witnesses would authenticate which documents. Our initial disclosures on the issues of infringement or invention, I mean, our initial disclosures did identify that. How about other things? Yes, I mean, there was never any complaint that we didn't identify with enough specificity for them to take the deposition of our witnesses. I mean, no... But his ruling doesn't have to do with the failure to identify people for deposition. He's saying that in listing your trial witnesses, you have to say which documents they're gonna cover, and that there's no such requirement. That's... You just list a witness. There's no... He didn't require the substance of the witness's testimony to be listed in some pretrial order. He could have, but he didn't. Yeah, so that... I agree, Your Honor. That is not in his rules, but there is a requirement. If you're gonna... You can't just have a witness testify at trial without providing proper notice of what the witness is gonna testify on. What case says that? Again, I would go to Rule 26A. It certainly wasn't... That's about discovery, not about trial witnesses. But it's certainly not an abuse of discretion for Judge Albright to say, I'm not gonna let someone the day before or a week before trial just add on a witness when it's never been disclosed before that this witness was gonna be testifying on the topic you want him to testify on. It had nothing to do with Diwali or anything else, Your Honor. And just, if I could, the Max Lake documents, there was a lack of specificity. There always has as to what these documents actually show. The 2014 document that was referenced, preliminary. It says it hasn't been shown to this court because on its face it says preliminary. The other specification sheet they talk about says it's... That wasn't the argument for excluding them, though, right? Well, it is. I mean, it does go... I think Your Honor asked what these documents were about or who was asking. Okay, but you didn't argue below that the documents should be excluded because they weren't probative because they were marked preliminary, correct? No, we didn't. We didn't. I mean, the argument that we made below is that they had... Actually, they didn't attempt to actually move these into the record at trial. They didn't use them as a demonstrative at trial. They don't actually show, or in any way in the expert report or anywhere else, they don't show that these specific Max Lake tubes were actually on sale. And that goes to DX41. The tubes in DX41, the wattage actually is critical, not to meeting the limitations, Your Honor, but it's extremely critical to whether the actual tubes they relied on were actually on sale. Because if the wattage was different, I think it's tube A, tube B. They had testimony or proposed testimony in the expert report that the 14 watt tubes met the claim limitations, right? So, yes, met the claim limitations. No, had nothing to do with actually showing that the specific tube in DX41, maybe that was on sale. It is not. It doesn't show that the tubes they relied on in the liturgy case were on sale. In no way does it. Okay, do you wanna... We'll give you a couple of minutes to address the damages issue, if you wanna do that. So, with respect to damages, I think this is not a case where there were 150 agreements, or there's decades of history, or there's, frankly, a lot of evidence. There was a limited universe of evidence. But you didn't put in a witness... You put in an expert witness who, by her own admission, wasn't a technical expert and had no knowledge of the valuation, relative valuation of the patents and the license agreements. So that seems to be a problem, because the expert's not qualified to testify about that. So, she did say that she relied on... This is volume two, appendix 101, 21, 54 through 55. She did say that she relied on a document that identified the 140 patents, 140 patent and other patents related to the 540 and 125. And she did testify that she relied on our technical expert, Dr. Don Dredge, for the... But you didn't put him on, right? But she's allowed to rely on the... No. You're not allowed to rely on fact witness testimony without putting the fact witness testimony into evidence. Okay, Your Honor. It's not like she just took... Their argument is that she didn't actually apportion it. There's testimony that she did. She took into account that there was a portfolio. She took into account that there were only certain patents related to the... Were actually at issue in the case. She did do that. And what she said is, there are other things that weren't... Their issue is the result, primarily. She did say that, look, there's fierce competition that basically super lighting at the hypothetical negotiation is not gonna treat CH lighting the same way that it did TCP. No way. And that is pushing up the royalty rating. What does pushing up even mean? The whole point here is, you need to do some kind of sound economic translation of the previous license to account for all the differences that exist with the current situation. And just saying pushing up doesn't really seem very economically sound to me in terms of trying to make that translation. Yeah, so my word, I apologize, Your Honor. That's fine, but in substance, that's kind of what she basically was saying, and that was her analysis. You would kind of hope a PhD in economics would be doing this kind of analysis that would be doing something a little bit more quantitative and mathematical and sophisticated, and that's not what we see here at all. Yeah, I think in some cases that's possible, but here, again, we had two agreements, both sides agreed that they were at a certain level comparable. There was limited testimony on benefits and commercial success and other things. I mean, both experts looked at this small universe of evidence. Both experts were cross examined, and it went to the jury. The jury was instructed on damages law. But there is a gate keeping function that the district court must engage in here. And in order to ensure that there's some baseline level of reliability in the methodology, and to even determine whether there is a methodology. And here, it feels, I don't know, based more on instinct than anything else. Yeah, so I don't think there's any requirement in the law yet that you have to say, I'm gonna increase 20 cents for this, or decrease 15 cents for that. I mean, they're just... In this particular case, there just... There wasn't a history or evidence, and frankly, neither expert did that. I understand that damages is my burden. But just, I think with a limited set of evidence... Was there any testimony to the effect of... We've tried to undertake a more rigorous economic based analysis here, but the universe of available facts are so limited that, for better or for worse, I'm compelled to actually just use this, for now, what we'll call the pushing up, pushing down approach to trying to do the translation. Because there literally is nothing better available under the circumstances. Is there anything like that? There's not that. I mean, what there is... So then, therefore, all the evidence... The disturbing thing is, is when experts seem to use this pushing up, pushing down approach as a matter of first resort, rather than as a matter of last resort. And that's the concern that I have with cases like this. Okay, you're on. What is the status of the parallel PTO proceedings? I think there are some, right? There was two. On the 540 patent, it's effectively over, if not over. The reexamination certificate is issued with the claim still valid. 125 is still at the PTAB. We have... Currently, the claims have been found invalid. We're requesting reconsideration there. To the board panel? To the board panel. And then, if we don't resolve that, we'll be filing something with this court. Okay. And are there any IPRs? There's nothing right now, Your Honor. No current litigation either. Okay, so it's just the one reexam for the 125? It's the 125. Yes, thank you. I think we're out of time. Thank you, Mr. Bernstein. Mr. Lampe, you have two minutes. Thank you. I think I'd like to start with the evidence regarding the Phillips two bit trial, which I believe my opposing counsel mentioned. I'd like to just point out on page 10186, the appendix, he testified in response on cross, said, I particularly called out the Phillips tube from the product specification sheet in my expert report that was dated 2014. So he gave the date to the jury of the Phillips spec sheet. If you turn to the expert report, which I believe my colleague said doesn't have a date, if you look at page 11,229, there's the Phillips spec sheet, and it says, specification sheet dated November 28th, 2014. So the Phillips sheet has a date. It's on sale at that time. I believe my colleague said that this was all related to inequitable conduct only. But the expert report defies that, because if you look at page 11,258, paragraph 1194, he says that this shows that... He says, he mentions that it was in possession, and he goes and says, this shows that it was not novel and not non obvious. That's not inequitable conduct. Not novel, non obvious. That's invalidity. But it wasn't officially in the section of his report that was about inequitable conduct, right? It is in that section, but he is saying flat out that it is not novel and not obvious. And for some strange reason, he didn't repeat that same statement in the invalidity section of his report. He did not, but the district court understood, if you look at page 69, district court understood that he was talking about... That this showed that the tubes were extant. So if you look, the court says, and this is page 10,115, but the fact that they were in possession shows that the parts were extant. The existence is what this proves, and the date of that teardown, the date of that teardown is, I can't tell whether it's 5-8 or 8-5, but it's in 2014, before the critical date of 2016. It shows that these tubes, or virtually identical tubes, were in Supra's possession before the critical date, before the priority date, and they tend to show invalidity for that reason. The opposing counsel said that their pre trial disclosures actually did identify the witnesses that would authenticate particular documents. Yeah, so I think... So, maybe you are wrong? No, I don't think I'm wrong about that. I think 21,322 is the page, and if you look at that, it says that they have the right to call any witnesses necessary to prove up any document or things, such as authenticating any witness. It doesn't say we're gonna give this witness to authenticate this document. They have the right to call any witnesses necessary to prove up any document or things, such as authenticating. If that's good enough, certainly what we did was good enough, but the bottom line is there isn't a rule that says you must identify in advance which documents which witness will authenticate. And when you have a corporate witness, under Texas practice, it's absolutely normal to say, I will use a corporate witness, a corporate representative. We pointed that on page 43 of our brief. We put it on page 41 of our brief, and I have not heard a response yet. To apply a non existent rule unevenly to the parties, that's an abusive expression. I'm sorry, just one last question about damages. Let's assume that this record really is the universe of available information to do a rational calculation for damages here. What, in your view, could they have done specifically that they did not do that would get to a more precise damages calculation? Well, I think the universe, they can actually look at the patents and figure out whether or not that, and to what degree they're overlapping. But even apart from that, the push up, push down, there's just no basis for saying that the push up is roughly equivalent to the push down, and the push ups are completely... I know your criticisms. I'm trying to figure out, well, what was it that they actually should have done under the circumstances here that they did not do? Look at the patents and determine whether or not the patents that aren't asserted add value beyond the patents that are asserted. And that simply wasn't done. And you don't have to do it with that mathematical precision, but it has to be done so you know what you're counterbalancing. You can't say that the pile of gold over there counterbalances the pile of feathers here without knowing the size of the pile of the gold or the size of the pile of the feathers. And all the counterbalancing here is actually completely irrational. One of the arguments is, oh, it counterbalances because the prices of these tubes, the LED tubes, were declining over time. But our hypothetical negotiations, 2018, they have a license in 2016, they have a license in 2021. So you might expect that the royalty would be somewhere between the 2016 and the 2021 because prices are declining. But instead, they come up with a royalty that is three times the 2016 royalty, about that, and one and a half times the 2021 royalty. That's just patently irrational, trying to say, well, we'll move it up because the two prices were declining. In fact, the fact that two prices... You're a competitor, though. Pardon? You're a competitor, not a customer. So that doesn't really work either, Your Honor, because first, TCP was also a competitor. Our co-defendant, Elliot, who I'm representing here, is not a competitor. Elliot is a distributor. Elliot's paying the same royalty that CH Lighting is paying. That just can't add up. And even if you're going to say, oh, it's a competitor, then you're gonna have to say, well, the competitor moves it up by something commensurate, by some degree compared to what the other 257 patents. Do we have any evidence that somehow the fact that we're a competitor offsets 257 patents? No, we just have a push up, push down. It's simply not the type of analysis that's sufficient under this court's decision in Wyland. It's not any good under MLC, and it's not very good, any good under Omega. If the court has no further questions... Okay, I think we're done. Thank you. Thank you, Your Honor. Thank you. Thank both counts for the cases submitted.